ELLINGTON, Judge.
 

 On July 29, 1999, Mark O. Barton went on a shooting spree at the offices of two day trading firms, killing nine people and injuring twelve. In these cases, six of the people who survived the wounds Barton inflicted, and the survivors of seven of the people who died, sued for damages resulting from Barton's attacks.
 
 [1]
 
 The named
 

 **890
 

 defendants included the two day trading firms, All-Tech Investment Group, Inc. ("All-Tech")
 
 [2]
 
 and Momentum Securities, Inc. ("Momentum"), and Barton Protective Services, Inc. ("BPS"), which provided security services at the two buildings. The appellants who were injured at All-Tech asserted liability as to Momentum (as well as to All-Tech), and vice versa.
 

 After a hearing, the trial court granted the motions for summary judgment filed by All-Tech and Momentum (collectively "the trading firms"). The trial court also granted BPS's motion for summary judgment, addressing the two locations in separate orders. The plaintiffs-below appeal these three orders, contending material questions of fact remain for jury resolution. For the reasons which follow, we affirm.
 

 Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56(c). To obtain summary judgment, a defendant need not produce any evidence, but must only point to an absence of evidence supporting at least one essential element of the plaintiff's claim.
 
 Lau's Corp. v. Haskins,
 

 261 Ga. 491
 
 ,
 
 405 S.E.2d 474
 
 (1991). We apply a de novo standard of review to an appeal from a grant of summary judgment and view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.
 

 (Citation omitted.)
 
 Ponder v. Brooks,
 

 256 Ga.App. 596
 
 , 597,
 
 569 S.E.2d 267
 
 (2002).
 

 Viewed in this light, the record shows the following undisputed facts.
 

 Day Trading.
 
 Day trading is a form of financial securities trading in which traders place multiple buy and sell orders for securities and hold the positions for a very short period of time, usually less
 

 **891
 

 than one day, seeking to profit from the daily fluctuations in stock prices. In exchange for a commission on each trade, All-Tech and Momentum, as day trading firms, provided their customers
 
 *520
 
 access to computer terminals and specialized computer software used in day trading. At each of these trading firms, the terminals were located on a "trading floor": a large common room which was not locked or otherwise secured during business hours.
 

 Day trading is highly speculative. A large majority of day traders fail to profit from their trading.
 
 [3]
 
 All-Tech and Momentum each had policies to screen new day traders for suitability. Each provided new day traders with extensive disclosures about the risks of day trading and instructed day traders to use only "risk capital" for trading. Each had policies to monitor their customers' success and to reevaluate the suitability of customers whose accounts lost a certain percentage in a certain period of time.
 

 The Security Contracts.
 
 During the relevant times, All-Tech and Momentum each operated a day trading office in rented space on Piedmont Road in Atlanta: All-Tech in Building Eight of Piedmont Center and Momentum across the street at Two Securities Centre. Under separate contracts with the property managers, BPS provided security services at Piedmont Center and Two Securities Centre. In its contract with the management of Piedmont Center, BPS agreed to provide unarmed "protective services," including the following: to inform property management about severe weather and fire alarms, bomb threats, and power failures, to assist in evacuations as appropriate, to facilitate emergency response to medical emergency 911 calls and disasters, and to monitor elevator functions. BPS guards were to patrol the buildings and parking deck, looking for "hazardous conditions," and to investigate and report "all suspicious persons, vehicles, and circumstances," including property theft and vandalism, fighting, "horseplay," and gambling. The contract forbade BPS personnel to enter any tenant space except "for security purposes" and required BPS personnel to notify the supervising officer of the reasons necessitating the entry. Although the contract required BPS to restrict access to the buildings and parking deck after hours
 

 **892
 

 according to a specific protocol, during business hours, BPS's protective services did not include restricting access to the buildings, such as checking employees' and customers' identification, scanning packages, having visitors sign in or pass through a metal detector, etc. As instructed by property management, BPS maintained a denied-access list regarding certain individuals who were not allowed on the property.
 

 Similarly, in its contract with the management of Two Securities Centre, BPS agreed to provide unarmed security services including responding to alarms, "suspicious incidents," and "security related situations (including fires, accidents, internal disorders and attempts of sabotage or other criminal acts), in conformance with common sense and good judgment and in keeping with [the owner's and property manager's] policies and procedures." BPS agreed to enforce "access control procedures"; access control procedures, however, did not include restricting employees' and visitors' access to the buildings during business hours. The property manager retained the exclusive right to control and deny access to the building and sometimes notified BPS of individuals who should be denied access. The contract forbade BPS to search any tenant's leased space or question any tenant unless directed to do so by the property manager.
 

 Barton.
 
 Barton began trading at All-Tech in April 1998. He represented to All-Tech that his net worth was $500,000. All-Tech took no action to verify Barton's representations about his assets. Barton deposited $100,000 in his All-Tech account before he began trading. Over the next 11 months, Barton sustained heavy losses, including over
 
 *521
 
 $200,000 just in August 1998. No manager of All-Tech met with Barton about his losses or reevaluated his suitability for day trading. By May 10, 1999, Barton had lost more than his total investment of almost $400,000 and owed All-Tech more than $30,000. At that point, All-Tech closed Barton's account.
 

 Within days, Barton went to Momentum to open an account. He represented to Momentum that his net worth was $750,000. Like All-Tech, Momentum took no action to verify Barton's financial information. Again, Barton deposited $100,000 before he began trading. In the six weeks before his deadly rampage, Barton lost most of his total investment of $137,500. Managers froze his account, but no one met with Barton about his losses or reevaluated his suitability for day trading.
 

 Before going to All-Tech's and Momentum's offices on July 29, 1999, Barton called managers, announcing that he would be coming by with a check for each to reactivate his accounts. Between 2:00 and 3:00 p.m. that day, Barton went to Momentum's third floor office suite and asked to speak to a particular manager. Before that manager arrived, Barton shot another manager and then began shooting
 

 **893
 

 other people working on the trading floor. Barton left the Momentum suite, crossed the street, went to All-Tech's second floor office suite, and asked to speak to certain managers. While meeting with three managers in an office, Barton began firing his weapons. He left the office and continued firing, striking down several people working on the trading floor.
 

 All Cases
 

 1. The appellants challenge the grant of summary judgment in favor of the trading firms. Because the appellants failed to identify evidence which would support a conclusion that their damages were a reasonably foreseeable outcome of the trading firms' actions, we affirm.
 

 To state a cause of action for negligence under Georgia law,
 

 the following elements are essential: (1) A legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risk of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and, (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty.
 

 (Citation omitted.)
 
 Phillips v. South West Mechanical Contractors,
 

 254 Ga.App. 144
 
 , 145-146(1),
 
 561 S.E.2d 471
 
 (2002). Thus, summary judgment is appropriate in negligence cases when, viewing all the facts and reasonable inferences from those facts in a light most favorable to the plaintiff, the evidence does not create a triable issue on the question of proximate cause.
 
 Deese v. NationsBank of Ga.,
 

 222 Ga.App. 275
 
 , 278(2),
 
 474 S.E.2d 18
 
 (1996). "Although the question of proximate cause is ordinarily for the jury to decide, plain and indisputable cases may be decided by the court as a matter of law. In such plain cases, the inquiry is whether the causal connection between the defendant's conduct and the injury is too remote for the law to countenance a recovery." (Footnote omitted.)
 
 Thomas v. Food Lion,
 

 256 Ga. App. 880
 
 , 883(1),
 
 570 S.E.2d 18
 
 (2002).
 

 The appellants concede, as they must, that Barton's deadly assaults constitute intervening criminal acts of a third party between the trading firms' conduct and the appellants' injuries. "[G]enerally, an independent, intervening criminal act of a third party, without which the injury would not have occurred, will be treated as the proximate cause of the injury superseding any negligence of the defendant, unless the intervening criminal act is a reasonably foreseeable consequence of the defendant's negligent act." (Footnote omitted.)
 

 **894
 

 Thomas v. Food Lion,
 

 256 Ga.App. at 882-883
 
 (1),
 
 570 S.E.2d 18
 
 . See also
 
 FPI Atlanta, L.P. v. Seaton,
 

 240 Ga.App. 880
 
 , 884(2),
 
 524 S.E.2d 524
 
 (1999) (physical precedent only) (the "intervening criminal act of a third party, which directly caused the injury, will be treated as the supervening proximate cause of such injury" unless the act was a reasonably foreseeable consequence of defendant's negligence). In other words, the intervening criminal act of a third party, "without which the injury would not have occurred,"
 

 *522
 
 "break[s] the causal connection between the defendants' negligence and the injury unless the criminal act was a reasonably foreseeable consequence of the defendants' conduct."
 
 Davis v. Blockbuster, Inc.,
 

 258 Ga.App. 677
 
 , 679(1),
 
 575 S.E.2d 1
 
 (2002). Given the intervening criminal act of the third party, the question is whether that criminal act was a reasonably foreseeable consequence of the trading firms' conduct.
 
 Id.
 

 Foreseeable consequences are those which are "probable, according to ordinary and usual experience," those which, "because they happen so frequently[,] ... may be expected to happen again." (Punctuation and footnotes omitted.)
 
 Thomas v. Food Lion,
 

 256 Ga.App. at 882
 
 (1),
 
 570 S.E.2d 18
 
 . See also
 
 Cope v. Enterprise Rent-A-Car,
 

 250 Ga. App. 648
 
 , 651(2),
 
 551 S.E.2d 841
 
 (2001) (the law judges foreseeability of consequences "according to the usual experience of mankind"). "[O]ne is not bound to anticipate or foresee and provide against that which is unusual or that which is only remotely and slightly probable." (Citations and punctuation omitted.)
 
 Strickland v. DeKalb Hosp. Auth.,
 

 197 Ga.App. 63
 
 , 68(I)(2)(d),
 
 397 S.E.2d 576
 
 (1990).
 

 In arguing that the trading firms' conduct was the proximate cause of their injuries, the appellants contend Barton's shooting spree, although it was an intervening criminal act, was an "intervening consequence" of the trading firms' business practices, rather than an "intervening cause" of the plaintiffs' injuries, citing cases applying
 
 Southern R. Co. v. Webb,
 

 116 Ga. 152
 
 , 156,
 
 42 S.E. 395
 
 (1902). In
 
 Southern R. Co. v. Webb,
 
 the Supreme Court of Georgia held "[a] tortious act may have several consequences, concurrent or successive, for all of which the first tort-feasor is responsible. It is not intervening
 
 consequences,
 
 but intervening
 
 causes
 
 [,] which relieve [the original wrongdoer from liability]."
 
 116 Ga. at 156
 
 ,
 
 42 S.E. 395
 
 . The appellants contend Barton's murderous rampage was such an intervening consequence, a foreseeable event triggered by the trading firms' acceptance of Barton as a day trader and their self-interested and "predatory" failure to stop him from trading before he lost so much money. In their words, the trading firms, by the manner in which they operated their day trading businesses, created a "Frankenstein Monster," and Barton "was the victim of the original tort, and his subsequent criminal act was a result of and response to that tort."
 

 **895
 

 The appellants base their claim that the trading firms' conduct constituted a tort on the following specific averments:
 

 that day trading is risky, that [the trading firms] undertake efforts to determine suitability of their trading clients, that [the trading firms] violated their duty to determine the suitability of Mark Barton to day trade, that Mark Barton risked and lost substantial amounts of money which were not risk capital, that [the trading firms] facilitated Barton's losses through predatory practices, and that workplace violence is prevalent and recognized.
 
 [4]
 

 As to foreseeability, the appellants assert that it is "common knowledge that some people will become violent and seek revenge against a party they hold responsible for their financial losses." By itself, we find this statement too vague and generalized to support the appellants' claim of liability.
 
 [5]
 

 In addition to invoking "common knowledge," the appellants presented the testimony of a number of experts who opined that such an event was foreseeable. We have carefully reviewed the experts' testimony.
 

 *523
 
 When asked to identify the factual predicate for their opinions that this sort of incident in the day trading field was foreseeable, "an accident waiting to happen," the experts discussed generalized concepts of violent reactions to financial disaster and workplace violence. In addition, collectively they referred to four specific events: (1) in the early to mid-1990s, a distraught investor "shot up" a brokerage office in Florida, killing another customer; (2) in the mid-1990s, a day trader upset about his account being closed made unfulfilled death threats to the managers of the company; (3) in 1993, a man upset over large real estate losses shot several people in his lawyer's office in California; and (4) after the great stock market crash in 1929, many brokers committed suicide. Even assuming the previous events happened as described and the trading firms knew or should have known about them, the experts' testimony illustrates vividly
 

 **896
 

 that even arguably similar acts of violence were so unusual, contrary to ordinary experience, and rare that no reasonable jury could find the trading firms should have guarded against them.
 
 [6]
 

 Based on all the foregoing, and guided by the intervening criminal act cases cited here, we find this case is one in which the issue of proximate cause is so plain, palpable, and indisputable as to demand summary judgment for the defendants.
 
 [7]
 
 Accordingly, the trial court correctly granted the trading firms' motions for summary judgment.
 
 Thomas v. Food Lion,
 

 256 Ga.App. at 883
 
 (1),
 
 570 S.E.2d 18
 
 ;
 
 Alexander v. Sportslife, Inc.,
 

 232 Ga.App. 538
 
 , 540(2),
 
 502 S.E.2d 280
 
 (1998);
 
 Tucker Fed. Sav. &c. Assn. v. Balogh,
 

 228 Ga.App. 482
 
 , 483-484,
 
 491 S.E.2d 915
 
 (1997);
 
 Strickland v. DeKalb Hosp. Auth.,
 

 197 Ga.App. at 68
 
 (I)(2),
 
 397 S.E.2d 576
 
 .
 

 *524
 

 **897
 

 2. The appellants challenge the grant of summary judgment in favor of BPS. Because the appellants failed to identify evidence which would support a conclusion that BPS owed the appellants any duty, we affirm.
 

 Case Nos. A03A1843, A03A1844, A03A1846, A03A1849, A03A1850, A03A1851, A03A1852, A03A1853, and A03A1854
 

 (a) First, we consider the trial court's order granting BPS's motion for summary judgment with regard to the deaths and injuries Barton caused within All-Tech's office suite at Piedmont Center.
 

 (i) The appellants contend BPS owed them a duty to protect them from criminal assault within All-Tech's office suite, arguing they were third-party beneficiaries of BPS's contract with Piedmont Center's property manager. "[I]n personal injury cases, an injured party may not recover as a third-party beneficiary for failure to perform a duty imposed by a contract unless it is apparent from the language of the agreement that the contracting parties intended to confer a direct benefit upon the plaintiff to protect him from physical injury." (Citations and punctuation omitted.)
 
 Anderson v. Atlanta Committee for the Olympic Games,
 

 273 Ga. 113
 
 , 117(4),
 
 537 S.E.2d 345
 
 (2000). See OCGA § 9-2-20(b) (authorizing actions by third-party beneficiaries). Although the third-party beneficiary need not be specifically named in the contract, the contracting parties' intention to benefit the third party must be shown on the face of the contract.
 
 Northen v. Tobin,
 

 262 Ga.App. 339
 
 , 344(2)(b),
 
 585 S.E.2d 681
 
 (2003). "The mere fact that [the third party] would benefit from performance of the agreement is not alone sufficient." (Citations and punctuation omitted.)
 
 Armor Elevator Co. v. Hinton,
 

 213 Ga.App. 27
 
 , 30(2),
 
 443 S.E.2d 670
 
 (1994). We recognize that whenever a premises owner contracts with a private security company the parties may
 
 expect
 
 the security services provided to benefit invitees who visit the property. As we have held, however, an injured invitee may not recover against the security company for negligent performance if the contract is silent as to the parties'
 
 intent
 
 to confer that benefit.
 
 Anderson v. Atlanta Committee for the Olympic Games,
 

 273 Ga. at 117-118
 
 (4),
 
 537 S.E.2d 345
 
 ;
 
 Armor Elevator Co. v. Hinton,
 

 213 Ga.App. at 30
 
 (2),
 
 443 S.E.2d 670
 
 .
 

 In these cases, BPS's contract with Piedmont Center's management contained no language reflecting an intent to confer a direct benefit on any tenants' employees or customers. Consequently, construed in favor of the appellants, the evidence does not support a finding that the appellants were third-party beneficiaries of BPS's contract with Piedmont Center's property manager.
 
 Anderson v. Atlanta Committee for the Olympic Games,
 

 273 Ga. at 117-118
 
 (4),
 
 537 S.E.2d 345
 
 ;
 
 Armor Elevator Co. v. Hinton,
 

 213 Ga. App. at 30
 
 (2),
 
 443 S.E.2d 670
 
 .
 

 **898
 

 (ii) In addition to any duty arising from BPS's contractual obligation to Piedmont Center's property manager, the appellants contend BPS assumed a duty to protect them from criminal assault within All-Tech's office suite. In
 
 Huggins v. Aetna Cas. &c. Co.,
 

 245 Ga. 248
 
 , 249,
 
 264 S.E.2d 191
 
 (1980), Georgia adopted the rule regarding liability to third persons for the negligent performance of an undertaking, as set out in Restatement (Second), Torts, § 324A:
 

 One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
 

 Georgia courts have often applied Restatement § 324A when the theory of recovery was based on the defendant insurer's performance of an undertaking to inspect and correct or warn against workplace hazards such as malfunctioning boilers or hazardous chemicals.
 
 [8]
 
 Other jurisdictions have also applied
 
 *525
 
 Restatement § 324A to a defendant's undertaking to maintain appropriate traffic signals.
 
 [9]
 
 We find no precedent, however, for applying this section to a defendant's failure to prevent a violent attack. See generally annotations to Restatement (Second), Torts, § 324A.
 

 Generally speaking, a premises owner which provides some form of security can be liable for negligent performance of the undertaking only if the type of danger the injured person actually encountered was foreseeable.
 
 Adler's Package Shop v. Parker,
 

 190 Ga.App. 68
 
 , 71(1)(b),
 
 378 S.E.2d 323
 
 (1989). In
 
 Adler's Package Shop v. Parker,
 
 the shop's security guard, who had been hired because of previous thefts in the store, failed to prevent a patron's injuries from a violent attack
 

 **899
 

 committed by an acquaintance in front of the store.
 
 Id. at 68-69, 71
 
 ,
 
 378 S.E.2d 323
 
 . We held that the business owner was not liable for the negligent performance of the security operations "because the prior thefts previously committed within the store were not sufficiently similar so as to alert [the owner] to a risk of physical assault upon patrons occurring outside the premises and arising from the personal malice of the attacker, and thus the essential element of foreseeability was not present." (Citation omitted.)
 
 Id. at 71
 
 (1)(b),
 
 378 S.E.2d 323
 
 .
 
 [10]
 

 Similarly, in these cases, there is no evidence of prior incidents sufficiently similar so as to alert BPS to a risk of physical assault by a tenant's customer upon a tenant's other customers and employees. Further, as to Barton individually, it is undisputed that before the shootings, no one ever asked that BPS put Barton on denied-access lists for Piedmont Center or Two Securities Centre or expressed any other complaints or concerns about him. Thus, the appellants presented no evidence supporting a conclusion that BPS should have recognized the services it contracted to provide to All-Tech were "necessary," in the sense used in Restatement § 324A, to protect All-Tech's customers and employees from a violent rampage by a financially devastated day trader or by Barton specifically. Consequently, construed in favor of the appellants, the evidence does not support a finding that BPS assumed a duty to protect All-Tech's customers and employees from criminal assault within All-Tech's office suite that went beyond its contractual obligation to the Piedmont Center property manager.
 
 Adler's Package Shop v. Parker,
 

 190 Ga.App. at 71
 
 (1),
 
 378 S.E.2d 323
 
 (b).
 

 Because the appellants failed to identify evidence which would support a conclusion that BPS owed the All-Tech appellants any duty, the trial court correctly granted summary judgment on the appellants' negligence claims.
 

 Case Nos. A03A1842, A03A1845, A03A1847, and A03A1848
 

 (b) Finally, we will consider the trial court's order granting BPS's motion for summary judgment with regard to the deaths and injuries Barton caused within Momentum's office suite at Two Securities Centre. Although BPS's contract with Piedmont Center's
 
 *526
 
 management
 

 **900
 

 was not identical to its contract with Two Securities Centre's management, we find the differences were not material to the appellants' claims. Like its contract for Piedmont Center, BPS's contract with the Two Securities Centre's management contained no reference to any performance by BPS intended for the direct benefit of any tenants' employees or customers. Consequently, construed in favor of the appellants, the evidence does not support a finding that the appellants were third-party beneficiaries of BPS's contract with the Two Securities Centre property manager. See Division 2(a)(i), supra. Further, the evidence does not support a finding that BPS assumed a duty to protect Momentum's customers and employees from criminal assault within its office suite. See Division 2(a)(ii), supra. Because the appellants failed to identify evidence which would support a conclusion that BPS owed the Momentum appellants any duty, the trial court correctly granted summary judgment on the appellants' negligence claims.
 

 Judgments affirmed.
 

 BLACKBURN, P.J., and PHIPPS, J., concur.
 

 ON MOTION FOR RECONSIDERATION.
 

 The appellants have raised contentions on motion for reconsideration that merit response for clarification's sake. The appellants contend that "[b]ecause [the appellants] presented evidence showing that Barton's rampage was `triggered' by the [trading firms'] tortious conduct, summary judgment should not have been granted," citing
 
 Ontario Sewing Machine Co. v. Smith,
 

 275 Ga. 683
 
 , 686(2),
 
 572 S.E.2d 533
 
 (2002).
 
 [11]
 
 To clarify the applicable standard, we have amended our discussion of the circumstances under which an intervening criminal act of a third party becomes the sole proximate cause of an injury. See Division 1, supra. In addition, we wish to make it plain that we do not read the Supreme Court's decision in
 
 Ontario Sewing Machine Co. v. Smith,
 
 a products liability case involving a noncriminal intervening act, as changing the rule that where a plaintiff's injuries would not have occurred but for the intervening
 
 criminal
 
 act of a third party, the plaintiff cannot survive a motion for summary judgment without pointing to evidence that the intervening criminal act was foreseeable by the allegedly negligent defendant. See cases cited in notes 6 and 7, supra. This rule reflects in part the ancient principle that a plaintiff's case-in-chief requires proof that damages flowing
 

 **901
 

 from a defendant's negligence were foreseeable. See
 
 Southern R. Co. v. Webb,
 

 116 Ga. 152
 
 , 156,
 
 42 S.E. 395
 
 (1902);
 
 Hulsey v. Hightower,
 

 44 Ga.App. 455
 
 , 459,
 
 161 S.E. 664
 
 (1931). Because the appellants failed to identify evidence that Barton's criminal act was a reasonably foreseeable consequence of the trading firms' conduct, summary judgment was required, as we held in Division 1, regardless of whether there was evidence the trading firms' conduct "triggered" Barton's shooting spree.
 

 Motion for reconsideration denied.
 

 At Momentum Securities, Inc., Barton injured Andrew Zaprzala and killed Russell Brown, Edward Quinn, and Scott Allyn Webb (collectively "the Momentum appellants"). At All-Tech Investment Group, Inc., Barton injured Volkhard Herder, Harry Edward Higginbotham, Yuzef Liberzon, Charlie N. Williams, and Meredith Winitt. At All-Tech, Barton killed Dean Delawalla, Jamshid Havash, Vadewattee Muralidhara, and Allen Tenenbaum (collectively, with those injured at All-Tech, "the All-Tech appellants"). In Case No. A03A1842, Helen Brown brought suit as Russell Brown's surviving parent. In Case No. A03A1843, K. Muralidhara brought suit as Vadewattee Muralidhara's surviving spouse. In Case No. A03A1844, Volkhard Herder brought suit for his injuries. In Case No. A03A1845, Andrew Zaprzala brought suit for his injuries, and his spouse, Jola Zaprzala, sued for loss of consortium. In Case No. A03A1846, Roya Havash brought suit as Jamshid Havash's surviving spouse. In Case No. A03A1847, Marie Quinn brought suit as Edward Quinn's surviving spouse. In Case No. A03A1848, Alyce F. Wenzel brought suit as Scott Allyn Webb's surviving parent. In Case No. A03A1849, Yuzef Liberzon brought suit for his injuries, and his spouse, Galinz Gogenko, sued for loss of consortium. In Case No. A03A1850, Gulshan Harjee brought suit as Dean Delawalla's surviving spouse. In Case No. A03A1851, Harry Edward Higginbotham brought suit for his injuries, and his spouse, Maryellen Higginbotham, sued for loss of consortium. In Case No. A03A1852, Meredith Winitt brought suit for her injuries. In Case No. A03A1853, Debra Tenenbaum brought suit as Allen Tenenbaum's surviving spouse. In Case No. A03A1854, Charlie N. Williams brought suit for his injuries, and his spouse, Linda Williams, sued for loss of consortium.
 

 The plaintiffs named as a defendant Equity Management, LLC. Equity Management is comprised of the two people who, as branch managers, opened All-Tech's Atlanta office. Equity Management leased and furnished the space used by All-Tech and paid for advertising and other expenses associated with a seminar given to recruit customers. All business operations at the All-Tech office were controlled by All-Tech and not by Equity Management. In this opinion, Equity Management and All-Tech are identified collectively as "All-Tech."
 

 After an eight-month study of the industry, the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs of the United States Senate reported its conclusion that "only a small fraction of novice day traders are ever profitable and that, even among well capitalized and experienced day traders, a majority will lose money." (Capitalization and italics omitted.) Senate Report 106-364, p. 31. In one study, which the subcommittee found to present "the most accurate picture of profitability in the day trading industry," examiners concluded that "net of commissions, 77 percent of the traders were unprofitable. Moreover, even for the remaining 23 percent that incurred net gains, the profits were small in comparison to the individual losses suffered by the vast majority of day traders." (Footnotes omitted.) Id. at 32.
 

 We note that, in framing their theory of recovery in these cases, the appellants expressly do
 
 not
 
 allege the trading firms are liable for Barton's criminal acts because they negligently maintained dangerous premises. See, e.g.,
 
 Doe v. Prudential-Bache/A.G. Spanos Realty Partners,
 

 268 Ga. 604
 
 , 606,
 
 492 S.E.2d 865
 
 (1997) (no premises liability for violent sexual assault in an apartment parking deck when previous criminal activity on premises consisted of thefts from vehicles and vandalism);
 
 Sturbridge Partners v. Walker,
 

 267 Ga. 785
 
 , 786,
 
 482 S.E.2d 339
 
 (1997) (possible premises liability for violent sexual assault in an apartment when the owner knew of two prior burglaries).
 

 We are also troubled by the implication that the list of defendants potentially liable for any person's violence, if sparked by economic misfortune, would be limited only by the number of stock brokers, investment advisers, lawyers, business partners, lottery ticket sellers, etc., whom the assailant blamed for his financial losses.
 

 Further, it is undisputed that before Barton pulled out his weapons, no employee of All-Tech or Momentum had any reason to believe Barton in particular could be dangerous. See
 
 Walker v. Hammock,
 

 246 Ga.App. 640
 
 , 641-642(1),
 
 541 S.E.2d 439
 
 (2000) (where a party guest intentionally pushed another guest off of a porch, and the premises owner had no warning the assaultive guest posed any danger to other guests, the owner was entitled to summary judgment on negligence claims based on providing alcohol and failing to install railings on the porch);
 
 Perkins v. Morgan County School Dist.,
 

 222 Ga.App. 831
 
 , 836-837(3),
 
 476 S.E.2d 592
 
 (1996) (where a student released early from school was murdered, and the school had no notice that the murderer posed a threat to the student, the school district was entitled to summary judgment on negligent supervision claims). Cf.
 
 Bradley Center v. Wessner,
 

 250 Ga. 199
 
 , 202-203,
 
 296 S.E.2d 693
 
 (1982) (where a committed mental patient released on a weekend pass murdered his wife and her lover, and a doctor knew the patient would likely cause bodily harm to his wife if given the opportunity, the hospital could be held liable for failing to confine the patient);
 
 Associated Health Systems v. Jones,
 

 185 Ga.App. 798
 
 , 802(1),
 
 366 S.E.2d 147
 
 (1988) (where a nursing home resident assaulted another resident, and the staff knew of the resident's pattern of assaultive behavior, the home could be held liable for negligent supervision).
 

 See
 
 Thomas v. Food Lion,
 

 256 Ga.App. at 883
 
 (1),
 
 570 S.E.2d 18
 
 (where a grocery store showed the husband and brother-in-law of a woman groped in the store a videotape of the incident, and the grocery store had no warning the men would identify and kill the woman's assailant, the store was entitled to summary judgment on resulting negligence claims);
 
 Cope v. Enterprise Rent-A-Car,
 

 250 Ga.App. at 651
 
 (2),
 
 551 S.E.2d 841
 
 (where the driver of a rented truck which broke down was attacked while stranded, the rental company was entitled to summary judgment on the driver's claims because the attack was not a natural and probable consequence of the company's failure to maintain the truck);
 
 Alexander v. Sportslife, Inc.,
 

 232 Ga.App. 538
 
 , 540(2),
 
 502 S.E.2d 280
 
 (1998) (where two athletic club members fought after playing basketball, and the club had no warning attacks would occur, the club was entitled to summary judgment on claim it failed to adequately supervise game);
 
 Tucker Fed. Sav. &c. Assn. v. Balogh,
 

 228 Ga.App. 482
 
 , 483-484,
 
 491 S.E.2d 915
 
 (1997) (where a bank robber shot a motorist and took his car after dye pack exploded in getaway car, the bank was unable to predict the robber's actions and was entitled to summary judgment on the motorist's claim that the bank teller negligently disregarded the robber's instruction not to include a dye pack in the money bag);
 
 Wright v. Ashe,
 

 220 Ga.App. 91
 
 , 94-95,
 
 469 S.E.2d 268
 
 (1996) (where a student was killed in a car accident while skipping school, and the school could not anticipate another student's reckless driving, the school was entitled to summary judgment on claim it negligently failed to supervise students);
 
 Strickland v. DeKalb Hosp. Auth.,
 

 197 Ga.App. at 68
 
 (I)(2),
 
 397 S.E.2d 576
 
 (where a hospital treated a patient for a dislocated shoulder with "incapacitating drugs" and then failed to supervise him, the hospital's conduct was too remote from the patient's later conduct of fatally shooting his wife to authorize claim against the hospital).
 

 See
 
 Universal Underwriters Ins. Co. v. Smith,
 

 253 Ga. 588
 
 , 590-592,
 
 322 S.E.2d 269
 
 (1984) (high pressure hose at car dealer);
 
 Cleveland v. American Motorists Ins. Co.,
 

 163 Ga.App. 748
 
 , 752(2) (
 
 295 S.E.2d 190
 
 (1982) (steam-generating boiler at power plant);
 
 Argonaut Ins. Co. v. Clark,
 

 154 Ga.App. 183
 
 , 185-188,
 
 267 S.E.2d 797
 
 (1980) (unstable slope on construction site);
 
 Sims v. American Cas. Co.,
 

 131 Ga.App. 461
 
 , 468-473,
 
 206 S.E.2d 121
 
 (1974) (volatile chemical in a manufacturing reactor).
 

 See, e.g.,
 
 Fink v. Kasler Corp.,
 

 3 Haw.App. 270
 
 , 272-273,
 
 649 P.2d 1173
 
 (1982) (a construction contractor which undertook to maintain stop signs was potentially liable for accident caused by a missing sign);
 
 Schmeck v. City of Shawnee,
 

 232 Kan. 11
 
 , 28-29,
 
 651 P.2d 585
 
 (1982) (a power company which undertook to install traffic signals was liable for an accident at an improperly marked intersection).
 

 See also
 
 Glick v. Olde Town Lancaster, Inc.,
 

 369 Pa.Super. 419
 
 , 425,
 
 535 A.2d 621
 
 (1987) (a property owner, which failed to secure a vacant building where a rape occurred, was not liable to the victim because the harm suffered by the victim was not "the type of risk which [the owner's] promise to resecure the dwellings was intended to avert");
 
 Nottingham v. Akron Bd. of Ed.,
 

 81 Ohio App.3d 319
 
 , 323,
 
 610 N.E.2d 1096
 
 (1992) (a school board, whose guard failed to prevent the dog which attacked a student from being brought to campus, was entitled to summary judgment; "the board did not undertake to fortify the parking lot from all potentially dangerous intruders throughout the lunch break").
 

 In
 
 Ontario Sewing Machine Co. v. Smith,
 
 the Supreme Court of Georgia stated, "[F]or an intervening act of a third party to become the sole proximate cause of a plaintiff's injuries, the intervening act must not have been foreseeable by defendant, must not have been triggered by defendant's act, and must have been sufficient by itself to cause the injury." (Punctuation and footnote omitted.)
 
 275 Ga. at 686
 
 (2),
 
 572 S.E.2d 533
 
 .