**November 20, 2015**

# In the Court of Appeals of Georgia

A15A1491. GOLDSTEIN, GARBER & SALAMA, LLC v. J. B.

McFADDEN, Judge.

A jury found Goldstein, Garber & Salama, LLC ("GGS"), a dental practice, liable to J. B. on the theory that GGS's negligence resulted in her being sexually assaulted by Certified Registered Nurse Anesthetist Paul Serdula while she was under anesthesia at GGS's office, and the trial court entered judgment on that verdict. On appeal, GGS contends (1) that the trial court erred in denying its motion for directed verdict because J. B. did not establish that GGS was liable under either a theory of negligence per se or professional negligence; (2) that the trial court erred in making numerous evidentiary rulings; and (3) that the jury's assignment of no fault to Serdula on the verdict form requires a new trial. We find, however, that the trial court did not err either in allowing the jury to decide the issue of GGS's liability or in her

evidentiary rulings, and that GGS has waived its challenge to the jury's verdict. Accordingly, we affirm.

1. *Facts.*

We review the judgment entered by the trial court after approval of a jury verdict using the "any evidence test, absent any material error of law." *Boston Men's Heath Center v. Howard*, 331 Ga. App. 217, 218 (715 SE2d 704) (2011) (punctuation omitted). So viewed, the record reflects that on September 16, 2009, J. B. underwent a three-phase dental procedure at GGS. In one phase of the procedure, Dr. Maurice Salama surgically installed a post for a tooth implant. Nurse Serdula administered anesthesia to J. B. for this phase. In a subsequent phase, Dr. David Garber placed a temporary dental prosthetic device in place of the future implant.

Between the conclusion of Dr. Salama's surgical procedure and the beginning of Dr. Garber's cosmetic procedure, J. B. remained in a heavily sedated state for approximately two hours. At some point during this period, J. B. was left alone with Serdula, who made three brief video recordings of her: one in which he looked down her shirt at her breasts, another in which he moved her underwear to reveal her vagina, and a third in which he placed his penis between her lips. These videos of J. B. were later discovered when Serdula's hidden cell phone was found recording

2

employees in GGS's office restroom. Examination of the phone also revealed videotapes of Serdula sexually molesting other anesthetized patients. Serdula eventually pleaded guilty to numerous charges related to the vile acts he perpetrated against J. B. and other victims, and he was sentenced to life in prison.

J. B. sued GGS, asserting, among other things, that GGS was liable for negligence per se and professional negligence. The case proceeded to trial, at which expert evidence was presented that GGS had violated certain statutory requirements for dentists supervising certified registered nurse anesthetists and had violated certain standards of care for monitoring patients under anesthesia. The trial court denied GGS's motion for directed verdict, and the jury awarded $3.7 million to J. B. and apportioned 100 percent of the liability to GGS and none to non-party Serdula. (J. B. had initially sued Serdula, but voluntarily dismissed him from the action before trial.)

2. *Directed verdict.*

GSS argues that the trial court erred in denying its motion for directed verdict because J. B. did not prove liability by negligence per se or professional negligence. GGS argues that there was not evidence to show the proximate cause required for both causes of action. It further argues that J. B.'s negligence per se claim fails

because the statute at issue did not intend to prevent the harm she suffered, and that her professional negligence claim fails because the conduct at issue did not involve the exercise of professional judgment and skill. We find no merit in these arguments. There was evidence upon which the jury could find the proximate cause required for both of these causes of action, and GGS's other arguments related to these causes of action lack merit.

a. *Proximate cause.*

We first address proximate cause because it is an element required for both negligence per se and professional negligence. *Allen v. Family Medical Center*, 287 Ga. App. 522, 524 (1) (652 SE2d 173) (2007); *Norman v. Jones Lang LaSalle Americas*, 277 Ga. App. 621, 628 (2) (b) (627 SE2d 382) (2006).

No single standard exists to determine proximate causation. *Atlanta Obstetrics & Gynecology Group v. Coleman*, 260 Ga. 569 (398 SE2d 16) (1990). Instead, as our Supreme Court has explained, "proximate cause is always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy and precedent." Id. (citation and punctuation omitted). This determination

> requires both factfinding in the "what happened" sense, and an evaluation of whether the facts measure up to the legal standard set by

4

precedent. Ordinarily, both determinations are appropriately made by a jury upon appropriate instructions from the judge. The decision may be made by the trial judge or the appellate court only if reasonable persons could not differ as to both the relevant facts and the evaluative application of legal standards (such as the legal concept of "foreseeability") to the facts.

Id. (citation omitted). Stated another way, questions regarding proximate cause "may only be determined by the courts in plain and undisputed cases." *Ontario Sewing Machine Co. v. Smith*, 275 Ga. 683, 686 (2) (572 SE2d 533) (2002) (citations and punctuation omitted).

"[T]he proximate cause of an injury may be two separate and distinct acts . . . acting concurrently and . . . the mere fact that the plaintiff's injuries would not have been sustained had only one of the acts . . . occurred will not of itself operate to limit the other act as constituting proximate cause." *Granger v. MST Transp.*, 329 Ga. App. 268, 270 (1) (764 SE2d 827) (2014) (citation and punctuation omitted). While *Granger* involved two acts of negligence, the rule it sets out applies where, as here, there is a negligent act and an intervening criminal act. *Georgia Dept. of Transp. v. Owens*, 330 Ga. App. 123, 131 (2) (766 SE2d 569) (2014); *Granger*, 329 g at 270-272 (1).

> For an intervening act to become the *sole* proximate cause of a plaintiff's injuries, the intervening act must not have been foreseeable by the defendant, must not have been triggered by the defendant's act, and must have been sufficient by itself to cause the injury. If the character of the intervening act was such that its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer, the causal connection is not broken.

*Zaldivar v. Prickett,* 297 Ga. 589, 601-602 (2) (774 SE2d 688) (2015) (citations and punctuation omitted; emphasis supplied); see also *Ontario Sewing Machine Co.,* 275 Ga. at 686 (2). Moreover, J. B., the plaintiff in this case,

> need not prove that [GGS] could foresee the precise manner in which [someone took advantage of her vulnerable state while anesthetized]. The foreseeability analysis is not that specific: the relevant inquiry is not whether the exact . . . intervening act was foreseeable, but whether, as a general matter, the original negligent actor should have anticipated that this general type of harm might result.

*Granger,* 329 Ga. App. at 271 (1) (citation and punctuation omitted). And as with the broader question of proximate cause, "the question of reasonable foreseeability of a criminal act is generally for a jury's determination rather than . . . adjudication by the

6

courts." *Sturbridge Partners v. Walker*, 267 Ga. 785, 786 (482 SE2d 339) (1997) (citation and punctuation omitted).

This is not a plain and undisputed case suitable for adjudication by the courts. The evidence does not show, as a matter of law, that GGS could not have reasonably anticipated that its patient might be victimized if left sedated to a medically-unjustifiable degree and for medically-unjustifiable amount of time without proper supervision. The record in this case is "replete with factual disputes [that pertain to the foreseeability of the intervening act] and the legal inferences to be drawn from those facts." *Atlanta Obstetrics & Gynecology Group*, 260 Ga. at 570 (footnote omitted).

The evidence must be viewed in the light most favorable to J. B. See *Mathews v. Cloud*, 294 Ga. 415, 416 (1) (754 SE2d 70) (2014) (in reviewing whether trial court erred in denying motion for directed verdict, we construe evidence in light most favorable to prevailing party). So viewed, the evidence showed that Serdula sedated J. B. at an unnecessarily deep level and for two hours more than necessary. This not only rendered her a more vulnerable target, but also constituted a violation of the standard of care and placed her at unnecessary risk of medical complications, which fortunately did not materialize.

7

The evidence, viewed most favorably to J. B., also showed that the dentists purporting to supervise Serdula were not qualified or competent to do so. They had not undergone the training or earned the certifications required of dentists who would supervise nurse anesthetists, see OCGA § 43-11-21.1 (governing qualifications required for dentist to supervise certified registered nurse anesthetist administering general anesthesia), which an expert witness opined rendered them unable to recognize J. B.'s level of sedation. They did not know how to read an anesthesia chart, and they depended upon Serdula to make decisions regarding J. B.'s anesthesia.

This evidence created jury questions as to whether it was foreseeable that the GGS dentists' failure to discharge their statutory duties and professional obligations would make J. B. vulnerable to the predation she suffered. See *Ontario Sewing Machine Co.*, 275 Ga. at 687 (2) (finding jury questions regarding the reasonableness of sewing machine manufacturer's recall and the foreseeability of plaintiff's failure to comply with it).

It is true, of course, that most anesthetized patients are not assaulted. And there was no evidence that GGS knew of Serdula's previous assaults on patients. We are not persuaded, however, that the relatively uncommon nature of Serdula's intervening acts compels a determination that GGS could not reasonably have foreseen them. In

8

*Medical Center Hosp. Auth. v. Cavender*, 331 Ga. App. 469 (771 SE2d 153) (2015), and *Brown v. All-Tech Investment Group*, 265 Ga. App. 889 (595 SE2d 517) (2004), we stressed the unusual nature of workplace shooting incidents to hold that those incidents were not reasonably foreseeable as a matter of law. *Cavender*, supra at 475-476 (1) (a); *Brown*, supra at 895-896 (1). But unlike those cases, which concerned claims of ordinary negligence and premises liability, this case involves claims of negligence per se and professional negligence based on violations of statutory requirements and professional standards that address the specific needs and vulnerabilities of an anesthetized patient. Expert testimony was presented that the dental profession is aware that assaults like the one J. B. suffered do occur and actively seeks to prevent them. There was testimony, for example, that sexual assaults and molestation are considered "never events" in the medical community – occurrences that are preventable and should "never" happen. And there was expert testimony that the requirement for monitoring an anesthetized patient existed to safeguard patient safety, among other reasons.

Given the specific statutory requirements and professional standards that exist to protect anesthetized patients, we do not believe that the abuse of an anesthetized patient is "so unusual, contrary to ordinary experience, and rare that *no* reasonable

9

jury could find [GGS] should have guarded against [such abuse]." *Cavender*, supra at 475 (1) (a) (citation and punctuation omitted; emphasis supplied). We should not substitute our judgment for that of the jury as to whether proximate cause existed in this case.

   b. *Negligence per se.*

In addition to arguing that proximate cause did not exist as a matter of law, GGS also argues that the trial court should not have permitted J. B.'s negligence per se claim to go to the jury because OCGA § 43-11-21.1, the statute GGS violated, was not intended to prevent the type of injuries she suffered. See OCGA § 41-1-6 (when law requires person to "perform an act for the benefit of another or to refrain from doing an act which may injure another, although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby); *McClain v. Mariner Health Care*, 279 Ga. App. 410, 411 (2) (631 SE2d 435) (2006) (generally, plaintiff may assert claim of negligence per se arising from violation of statute if, among other things, "the harm complained of was the same harm the statute was intended to guard against"). We disagree.

OCGA § 43-11-21.1 governs the qualifications required for a dentist to supervise a certified registered nurse anesthetist administering general anesthesia.

While OCGA § 43-11-21.1 does not list the harms it intends to guard against, its requirements, among other things, address a dentist's ability to competently supervise a certified registered nurse anesthetist. There was evidence that the GGS dentists did not meet these statutory requirements and were unable to recognize J. B.'s inappropriate level of sedation.

And the legislative intent behind this statute is set out expressly in another Code section within the chapter: "[S]uch unlicensed activities as are mentioned in this chapter [including a dentist without proper qualifications allowing a certified registered nurse anesthetist to administer anesthesia] are a menace and a nuisance dangerous to the public health, safety, *and* welfare." OCGA § 43-11-2 (e) (emphasis supplied). This broad language encompasses unreasonable risks. Cf. *Central Anesthesia Assoc. v. Worthy*, 254 Ga. 728, 732 (2) (333 SE2d 829) (1985) (similar anesthesia statute applying to doctors serves to protect others against unreasonable risks); *Groover v. Johnston*, 277 Ga. App. 12, 16 (1) (b) (625 SE2d 406) (2005) (statute permitting doctors to delegate to nurses with specific certifications the authority to order certain drugs, treatments, and diagnostic studies, and which did not explicitly state a purpose, created a "duty recognized by the law to protect patients against unreasonable risk"). Contrary to the view expressed by Judge Dillard in his

11

dissent, this language encompasses both medical and non-medical dangers that could arise where, as here, a dentist is incapable of adequately supervising a certified registered nurse anesthetist, including the increased risk of a patient to abuse when the patient is placed under a greater level of sedation than necessary for a greater amount of time than necessary. See *Brown v. Belinfante*, 252 Ga. App. 856, 861 (1) (557 SE2d 399) (2001) (provisions of Georgia Dental Act serve to "protect[ ] the health and welfare of patients who submit themselves to the care of dentists, by guarding against injuries caused by inadequate care or by unauthorized individuals").

c. *Professional negligence.*

GGS argues in the alternative that this is not a professional negligence case. Because this case does not concern an exercise of professional judgment and skill required for a claim of professional negligence, GGS argues, J. B. must prove all the elements of a claim of ordinary negligence – including that Serdula's crimes were foreseeable. The argument is without merit. "An action for professional negligence . . . exists when the plaintiff's claim addresses the propriety of a professional decision rather than the efficacy of conduct in the carrying out of a decision previously made." *King v. Dodge County Hosp. Auth.*, 274 Ga. App. 44, 45-46 (616 SE2d 835) (2005) (citation and punctuation omitted). J. B.'s professional negligence claims address the

12

propriety of the professional decisions made by GGS regarding the treatment and care provided to its sedated patients, and expert evidence was submitted as to the professional standards that governed these decisions.

3. *Evidentiary rulings.*

a. *Evidence of prior assaults committed by Serdula.*

GGS argues that the trial court erred in permitting evidence of other assaults perpetrated by Serdula on GGS patients but excluding evidence of assaults perpetrated by him on patients of health-care providers other than GGS. J. B. correctly points out, however, that the trial court initially excluded all evidence of Serdula's other assaults. See OCGA § 24-4-403. She later permitted the evidence of other assaults on GGS patients for the purpose of impeachment after one of the GGS dentists testified that GGS never left a anesthetized patient with fewer than two people in attendance. See OCGA § 24-6-621. We discern no abuse of discretion. See *Rivers v. K-Mart Corp.*, 329 Ga. App. 495, 496 (1) (765 SE2d 671) (2014) ("As a general rule, admission of evidence is a matter resting within the sound discretion of the trial court, and appellate courts will not disturb the exercise of that discretion absent evidence of its abuse.") (citations and punctuation omitted); *Bolah v. Driskell*, 318 Ga. App. 405, 407 (734 SE2d 108) (2012) ("A trial court, in its discretion may

13

admit evidence relevant to the issue of impeachment even if the evidence would not qualify for admission on other grounds.") (citation omitted).

b. *Evidence of photographs posted on social media.*

GGS argues that the trial court erred in excluding, on relevance grounds, parts of an exhibit containing photographs that J. B. had posted on social media in the several years following the assault. Again, we discern no abuse of discretion in this evidentiary ruling. See *Rivers*, 329 Ga. App. at 496 (1).

c. *Rehearing of evidence.*

GGS argues that the trial court erred when, during jury deliberations, she permitted the jury to rehear a portion of evidence setting forth certain of GGS's responses to requests for admission but did not permit the jury to rehear a portion of the evidence containing certain expert witness testimony. The jury had asked to rehear both portions. Whether to accede to or decline the jury's request to rehear parts of the evidence was a matter with the trial court's discretion. *Byrd v. State*, 327 Ga. 781, 782-783 (1) (229 SE2d 631) (1976). And, as J. B. points out, the fundamental nature of the evidence at issue – party admissions versus expert testimony – differed. See generally *Piedmont Aviation v. Washington*, 181 Ga. App. 730, 731 (2) (353 SE2d 847) (1987) ("Answers to requests for admissions are not on the same footing

14

in the eyes of the law with other evidence.") (citation and punctuation omitted). We discern no abuse of discretion in the trial court's decision to permit the rehearing of the admissions while denying the rehearing of the expert testimony. Compare *Scroggins v. State*, 237 Ga. App. 122, 125 (5) (514 SE2d 252) (1999) (although ordinarily whether trial court will require court reporter to read former testimony is matter resting within trial court's sound discretion, trial court nevertheless abused its discretion in denying rehearing of testimony where parties in presence of jury a question about substance of that very testimony and serious disagreement existed regarding whether defense counsel had misstated testimony, which could be settled unequivocally by rehearing disputed testimony while causing little, if any, harm).

4. *Apportionment.*

a. GGS argues that it is entitled to a new trial because the jury's verdict form allocated no fault to nonparty Serdula. GGS frames this argument as a challenge to the sufficiency of the evidence to support the judgment. But that is not what it is; it is a challenge to the verdict. And GGS waived appellate review of this challenge by failing to obtain a ruling before the jury was dispersed.

Although the statutory grounds for a new trial do focus on the relationship between the evidence and the jury's verdict, OCGA § 5-5-20 et seq., a challenge to

15

the sufficiency of the evidence is a challenge to the judgment entered on the verdict, not a challenge to the verdict itself. OCGA § 5-5-40 (a) (motion for new trial to "be made within 30 days of the entry of the judgment"). The question properly before us is not whether the jury's verdict sufficiently reproaches Serdula, the convicted felon who assaulted J. B., but whether the evidence supports the judgment entered on that verdict. Because Serdula was not a named defendant, the trial court's judgment could not impose liability upon him. Judgment could be entered only against the sole named defendant, GGS – which it was.

GGS's sufficiency argument rests on an inference from the verdict form. The jury, GGS infers, found "that the predator was blameless for the injuries he caused." That does not follow. It is unlikely that the jury was composed of moral imbeciles. It is far more likely that the jury was fully cognizant of Serdula's blameworthiness, but also cognizant that it was not in their power to add to his punishment. Their duty was to determine if and in what amount civil liability should be imposed on GGS and, in the course of making that determination, to give due consideration to Serdula's fault. OCGA § 51-12-33 (c). They were apprised of that duty in the charge and on the verdict form. And we must presume that they faithfully discharged that duty.

16

The verdict form asked the jury to first set out the amount of damages they found appropriate and then to set out percentages of fault assigned to GGS and to Serdula. The form explained that the judge would reduce those damages by any percentage of fault assigned on the form to Serdula.

The jury's decision to assign no fault to Serdula on the verdict form may reflect their determination that GGS's liability would not be offset on the basis of Sedula's fault. If it were clear that the jury had made that determination, we would be faced with the question whether, under OCGA § 51-12-33 (c), the jury was required not only to "consider the fault" of "persons or entities" not party to the action "who contributed to the alleged injury or damages" but also – at least where there is undisputed evidence of such fault – to reduce the liability of the named defendant by some amount. As we explain below in subdivision (b), and as Judge Ray notes in his dissenting opinion, that question is conceptually difficult in this case because it requires the comparison of negligent and intentional acts. See Thomas A. Eaton, *Who Owes How Much? Developments in Apportionment and Joint and Several Liability Under OCGA § 51-12-33*, 64 Mercer L. Rev. 15, 17 (II) (A) (2012) (prior to 2005 enactment of Georgia's apportionment statute, "the long-standing rule in Georgia [was] that intent and negligence [were] not comparable") (discussing principles set

17

forth in Georgia cases such as *Gates v. Navy*, 274 Ga. App. 180, 183 (4) (617 SE2d 163) (2005)). And it is a question of first impression.

But it is a question for another day. The verdict may also reflect that, after considering Serdula's fault and adjusting their award in light of that fault, the jury intended to award J. B. $3,700,000 *from GGS* and that – perhaps uncomfortable with the complexity of the procedure described in the form – they expressed that intent in a way that ensured the judge would not further reduce the award, but that did not spell out their reasoning.

We cannot tell from looking at the verdict form exactly what was the jury's intent. Under OCGA § 9-12-4, however, "[v]erdicts shall have a reasonable intendment and shall receive a reasonable construction. They shall not be avoided unless from necessity." Consequently,

> [e]ven if the verdict is ambiguous and susceptible of two constructions, one of which would uphold it and one of which would defeat it, that which would uphold it is to be applied. Furthermore, in determining the proper interpretation of a jury verdict and to remove any ambiguity, the trial court may question the jury prior to dis[pe]rsal in order to clarify the jury's intent.

*Anthony v. Gator Cochran Constr.*, 288 Ga. 79, 80-81 (702 SE2d 139) (2010) (citations and punctuation omitted). See *Tucker v. Love*, 200 Ga. App. 408, 410 (3) (408 SE2d 182) (1991) (the time to resolve any questions about the jury's verdict was "when the verdict was returned so that the jury could clarify its meaning").

It is true, of course, as Judge Ray explains, that if the verdict was void – or if the verdict was ambiguous, but void in all its possible interpretations – then additional deliberations would not have been required. See *Anthony*, 288 Ga. at 80 (verdict that truly was contradictory and repugnant was void and no valid judgment could be entered on it, regardless of how it arose). In that case, preservation of error would not have been a prerequisite to enumerating as error the entry of judgment on the verdict. Id. Our disagreement with Judge Ray is that we hold at least one of the two possible interpretations of this verdict to be sustainable, while he would hold that both are void.

If she had been persuaded the verdict at issue was improper, the trial court, in her discretion, could have given the jury additional instructions and permitted them to consider the matter again. See *Force v. McGeachy*, 186 Ga. App. 781, 784 (1) (368 SE2d 777) (1988). GGS, however, did not ask the trial court for any relief that would clarify the verdict or otherwise afford the jury that heard the evidence an opportunity

to return an unambiguously proper verdict. See *Clifton v. Clifton*, 249 Ga. 831, 832 (294 SE2d 518) (1982). Although GGS objected to the verdict form as being "improper and incorrect" because of the jury's assignment of no fault to Serdula, it did not ask for a ruling on that objection. Instead, GGS stated that it was "just putting that on the record" for purposes of appeal. When the trial court asked whether there was "anything else before I have the jury back and have them released," GGS did not respond or otherwise object to the trial court dismissing the jury.

It is not enough for a party to object to perceived error. "[I]t is the duty of counsel to obtain a ruling on his motions or objections, and the failure to do so will ordinarily result in a waiver." *Olagbegi v. Hutton*, 320 Ga. App. 436, 437 (1) (740 SE2d 190) (2013) (citation and punctuation omitted). GGS, however, chose not to obtain a ruling on its objection or otherwise ask the trial court for relief, apparently hoping to seek a new trial with a different jury. "Upon hearing an improper verdict rendered, a litigant should not sit silently by, hoping to gain a retrial by failing to [secure a ruling on its] object[ion]." *Clifton*, 249 Ga. at 832 (citation omitted); accord *Tucker*, 200 Ga. App. at 410 (3). By failing to do so, GGS waived appellate review of its challenges to the form of the jury's verdict. See *Davis v. Whitford Props.*, 282 Ga. App. 143, 147 (2) (637 SE2d 849) (2006). Cf. *Anthony*, 288 Ga. at 80-81 (failure

20

to object to *void* verdict does not waive appellate review of error, but ambiguous verdicts are not void if they are susceptible of a construction that will uphold the verdict).

b. Nor should we reach GGS's apportionment argument under the plain error doctrine. That doctrine obtains only if, among other things, a ruling is not merely error but "obviously so." *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011) (citation omitted). Here the issue is one of first impression. Judge Ray's dissent cites to no authority finding the amount of damages awarded by a jury in a civil case to be plain error, and we are aware of none. And the general rule is that apportionment determinations are the jury's prerogative. See *Scapa Dryer Fabrics v. Knight*, 332 Ga. App. 82, 90 (4) (770 SE2d 334) (2015).

The issue is not only novel. It is also difficult. It is difficult because intentional and negligent torts are qualitatively distinct. See Ellen M. Bublick, *The End Game of Tort Reform: Comparative Apportionment and Intentional Torts*, 78 Notre Dame L. Rev. 335, 376 (2003). Our Supreme Court has implied that it reads the apportionment statute to leave the task of reconciling that distinction to the finder of fact. Answering in the affirmative a certified question whether a jury is "allowed to consider the 'fault' of [a] criminal assailant and apportion its award of damages among [a negligent

21

tortfeasor] and [a] criminal assailant, pursuant to OCGA § 51-12-33," *Couch v. Red Roof Inns*, 291 Ga. 359 (729 SE2d 378) (2012), the Supreme Court addressed and rejected the plaintiff's argument "that the [negligent tortfeasor] in this case cannot establish evidence to support any rational basis for apportionment." Id. at 366 (2). "That," the Supreme Court held, "is a question of fact not relevant to answering the legal questions set forth in this case." Id. (citation omitted). Under these circumstances, we should not decide the merits of GGS's apportionment challenge.

*Judgment affirmed. Barnes, P. J., Ellington, P. J., and Phipps, P. J., concur. Dillard, Ray, and McMillian, JJ., dissent.*

A15A1491. GOLDSTEIN, GARBER & SALAMA, LLC v. J. B..

DILLARD, Judge, dissenting.

I respectfully dissent. The trial court erred in denying GGS's motion for directed verdict because, contrary to the majority's holding, J. B. could not prove liability by negligence per se or professional negligence for the reasons set forth *infra*.

a. *Negligence Per Se.* I disagree that GGS could, under the facts of this case, be liable for negligence per se by its violation of OCGA § 43-11-21.1, which regulates the administration of deep sedation and general anesthesia. In pertinent part, OCGA § 43-11-21.1 prohibits dentists from "administer[ing] general anesthesia on an outpatient basis unless such dentist has been issued a permit by the board under the conditions specified in this Code section."[1]

---

[1] OCGA § 43-11-21.1 (a).

Permits under OCGA § 43-11-21.1 are only issued to a dentist who has "successfully completed a minimum of one year of advanced training in anesthesiology and related academic subjects beyond the undergraduate dental school level" at specific institutions or who is "a diplomate of the American Board of Oral and Maxillofacial Surgery, is a member of the American Association of Oral and Maxillofacial Surgeons, or is a fellow of the American Dental Society of Anesthesiology."[2] Additionally, in order to receive a permit, the dentist must utilize a "properly equipped facility for the administration of general anesthesia, including physical plant and equipment which has been evaluated and certified by an on-site examination[,]"[3] and have "demonstrated to the satisfaction of the board or any designee thereof proficiency in administering general anesthesia on a patient or patients in the dentist's office in a safe and effective manner."[4]

OCGA § 43-11-21.1 does not "prohibit a person who is duly licensed to practice medicine in this state and who is a member of the anesthesiology staff of an institution classified as a hospital and issued a permit as an institution under Code

---

[2] OCGA § 42-11-21.1 (b) (1) (A)-(B).

[3] OCGA § 43-11-21.1 (b) (2).

[4] OCGA § 43-11-21.1 (b) (3).

2

Section 31-7-1 from administering general anesthesia in a dental facility."[5] Nor does this statutory provision prohibit licensed CRNAs, such as Serdula, "from administering general anesthesia in a dental facility, provided that such anesthesia is administered *under the direction and responsibility of a dentist duly permitted* under this Code section . . . ."[6]

Here, it is undisputed, and the majority concedes, that J. B. suffered no medical complications as a result of receiving anesthesia at GGS. Nevertheless, the majority accepts J. B.'s argument that Drs. Salama and Garber did not "appreciate [her] level of sedation and attendant vulnerability," and holds that OCGA § 43-11-21.1 "encompasses both medical and non-medical dangers that could arise where, as here, a dentist is incapable of adequately supervising a certified registered nurse anesthetist, including the increased risk of a patient to abuse when the patient is placed under a greater level of sedation than necessary for a greater amount of time than necessary." Thus, the majority holds, in essence, that Drs. Salama and Garber's lack of the necessary permits and the anesthesiology training required to obtain such permits resulted in Serdula's act of sexual assault because he administered anesthesia

---

[5] OCGA § 43-11-21.1 (d) (1).

[6] OCGA § 43-11-21.1 (d) (2) (emphasis supplied).

3

to J. B. while under the direction and responsibility of dentists who were not permitted in accordance with OCGA § 43-11-21.1. I disagree with the majority's conclusions.

To begin with, when the law requires a person to "perform an act for the benefit of another or to refrain from doing an act which may injure another, although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby."[7] But even assuming that a statute or mandatory regulation has been violated, before negligence per se can be determined, a court must consider "(1) whether the injured person falls within the class of person it was [designed] to protect and (2) whether the harm complained of was the harm the statute was [designed] to guard against."[8]

---

[7] OCGA § 51-1-6.

[8] *Norman v. Jones Lang Lasalle Americas, Inc.*, 277 Ga. App. 621, 628 (2) (b) (627 SE2d 382) (2006) (punctuation omitted); *accord Brown v. Belinfante*, 252 Ga. App. 856, 861 (1) (557 SE2d 399) (2001); *see also Atlanta & W. P. R. Co. v. Underwood*, 218 Ga. 193, 195 (1) (126 SE2d 785) (1962) ("The court in determining whether the violation of a statutory requirement is negligence per se, as to the person complaining thereof upon which a cause of action will rest, will look to the particular statute in respect to its purposes; that is, the evils it was intended to guard against and the persons it was intended to protect." (punctuation omitted)).

Here, it is true that Drs. Salama and Garber admitted that they were operating in violation of OCGA § 43-11-21.1 when they did not possess the required permits. And it is undisputed that J. B. falls within the class of persons the statute was designed to protect. But the harm she suffered—*i.e.*, sexual assault by CRNA Serdula—is *not* the type of harm that the statute was designed to guard against.

Looking to the plain language of OCGA § 43-11-21.1, it is clear that the harm the statute is designed to guard against is not sexual assault while under the effects of anesthesia, but is instead the improper administration of anesthesia itself due to inadequate training, lack of experience, and/or the improper use of equipment, which can result in medical complications.[9] As pointed out by GGS, if this statute were

---

[9] *See Central Anesthesia Associates, P.C. v. Worthy*, 254 Ga. 728, 732 (2) (333 SE2d 829) (1985) (holding that statute requiring that certified nurse anesthetists operate under the direction and responsibility of licensed physicians trained and experienced in anesthesia when administering anesthesia was designed to protect against the improper administration of anesthesia causing medical complications); *Central Anesthesia Associates, P.C. v. Worthy*, 173 Ga. App. 150, 152 (325 SE2d 819) (1984) (holding that statute requiring that certified nurse anesthetists operate under the direction and responsibility of licensed physicians trained and experienced in anesthesia when administering anesthesia was designed "to protect patients from the dangers of improperly administered anesthesia by those unqualified by a lack of what public policy regards as minimum education in the field, and by a lack of specified supervision"); *see also Groover v. Johnston*, 277 Ga. App. 12, 16 (1) (b) (625 SE2d 406) (2005) ("Common sense dictates that if an unqualified person selects an improper drug or administers an improper type or amount of medication, especially to a patient emerging from anesthesia, disastrous consequences . . . are possible.").

designed to protect against *sexual assault* while under the effects of anesthesia, there is no conceivable reason why an anesthesiologist would be permitted to administer sedation without supervision while a CRNA may only do so "under the direction and responsibility of a dentist" who is duly permitted.[10] And while OCGA § 43-11-2 (e) declares that "such unlicensed activities as are mentioned in this chapter are a menace and a nuisance dangerous to the public health, safety, and welfare," this text cannot plausibly be interpreted as evincing a legislative design to protect patients against sexual assault when the very same text appears in a statute that applies to barbers and cosmetologists.[11] Accordingly, under the particular facts of this case, contrary to the majority's holding, J. B. could not show, as a matter of law, that GGS was liable for negligence per se by violating OCGA § 43-11-21.1.[12]

---

*Cf. Brown*, 252 Ga. App. at 861 (1) (holding that dentist's provision of cosmetic surgery services did not constitute the practice of dentistry and, as such, dentist violated statute by performing services that exceeded its scope; and the harm that plaintiff suffered—chronic infection, remedial corrective surgeries, speech impediment, and facial asymmetry—were the type of harm that statute was designed to prevent).

[10] *Compare* OCGA § 43-11-21.1 (d) (1) *with* OCGA § 43-11-21.1 (d) (2).

[11] *See* OCGA § 43-11-16 (providing actions to enjoin practice by unlicensed or unregistered barbers or cosmetologists, and containing the very same declaration that "the unlicensed activities referred to in this Code section are a menace and a nuisance dangerous to the public health, safety, and welfare").

[12] Even if J. B. could establish negligence per se, she would still need to "demonstrate a causal connection between the negligence per se and the injury."

6

b. *Professional Negligence.* The majority also accepts J. B.'s argument that GGS is liable for professional negligence by breaching the standard of care when its staff did not recognize J. B.'s level of sedation and left her, a female patient, alone under sedation with Serdula, a male CRNA, thereby providing him with the opportunity to perpetrate his criminal acts.[13] Again, I disagree.

Negligence is "not actionable unless it is the proximate cause of the injury."[14] And proximate cause is that which, "in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred."[15] Proximate cause acts as "a limit on legal liability; it is a policy

---

*Norman*, 277 Ga. App. at 627 (1) (b) (punctuation omitted); *see also Worthy*, 254 Ga. at 733 (2) ("Plaintiff must still prove proximate cause and actual damage in order to recover on a cause of action for "negligence." . . . [E]ven when negligence per se has been shown, proximate cause must still be proved." (citation omitted)); *Humphreys v. Kipfmiller*, 237 Ga. App. 572, 575 (2) (515 SE2d 878) (1999) ("Negligence per se is actionable negligence only where it is the proximate cause of the plaintiff's injuries."). And for the reasons discussed *infra*, she could not establish proximate cause.

[13] *See* OCGA § 51-1-27 ("A person professing to practice surgery or the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill. Any injury resulting from a want of such care and skill shall be a tort for which a recovery may be had.").

[14] *Johnson v. Am. Nat'l Red Cross*, 276 Ga. 270, 273 (578 SE2d 106) (2003) (punctuation omitted); *accord Ga. Dept. of Transp. v. Owens*, 330 Ga. App. 123, 130 (2) (766 SE2d 569) (2014).

[15] *Owens*, 330 Ga. App. at 130 (2) (punctuation omitted); *see also Cowart v. Widener*, 287 Ga. 622, 627-28 (2) (b) (697 SE2d 779) (2010) ("In the tort context,

decision that, for a variety of reasons, . . . the defendant's conduct and the plaintiff's injury are too remote for the law to countenance recovery."[16] One such reason can be the occurrence of an intervening act that breaks the causal connection.

On the issue of intervening acts, the Supreme Court of Georgia has explained that the general rule is that "if subsequently to an original wrongful act, a new cause has intervened, of itself sufficient to stand as the cause of the misfortune, the former must be considered as too remote[.]"[17] But if the character of the intervening act is such that "its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer, the causal connection is not broken and the original wrong-doer is responsible for all of the

---

proximate causation includes all of the natural and probable consequences of the tortfeasor's negligence, unless there is a sufficient and independent intervening cause."); *Palsgraf v. Long Is. R.R. Co.*, 248 N.Y. 339, 344 (1928) ("The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension." (citation omitted)).

[16] *Delta Airlines, Inc. v. Townsend*, 279 Ga. 511, 515 (1) (614 SE2d 745) (2005); *accord Owens*, 330 Ga. App. at 130 (2); *see also* OCGA § 51-12-9 ("Damages which are the legal and natural result of the act done, though contingent to some extent, are not too remote to be recovered. However, damages traceable to the act, but which are not its legal and natural consequence, are too remote and contingent to be recovered.").

[17] *Ontario Sewing Mach. Co. v. Smith*, 275 Ga. 683, 686 (2) (572 SE2d 533) (2002) (punctuation omitted); *accord Granger v. MST Transp., LLC*, 329 Ga. App. 268, 270 (1) (764 SE2d 872) (2014).

consequences resulting from the intervening act."[18] This latter rule applies even to intervening acts of a criminal nature.[19] Thus, although the general rule is that "the intervening criminal act of a third person will insulate a defendant from liability for an original act of negligence,"[20] that rule does not apply when it is alleged that "the defendant had reason to anticipate the criminal act."[21] And here, contrary to the majority's holding, Serdula's intervening criminal act of sexual assault could not have been anticipated by GGS and, thus, was not foreseeable as a matter of law.[22]

---

[18] *Ontario Sewing Mach. Co.*, 275 Ga. at 686 (2) (punctuation omitted); *accord Granger*, 329 Ga. App. at 270 (1).

[19] *Owens*, 330 Ga. App. at 131 (2); *see Williams v. Grier*, 196 Ga. 327, 338 (3) (26 SE2d 698) (1943) ("[When] there has intervened between the defendant's negligence and the injury an independent illegal act of a third person producing the injury, and without which it would not have occurred, such independent criminal act should be treated as the proximate cause, insulating and excluding the negligence of the defendant. But even this rule would not apply if the defendant 'had reasonable grounds for apprehending that such criminal act would be committed.'" (punctuation omitted)).

[20] *Bradley Ctr., Inc. v. Wessner*, 250 Ga. 199, 202 (1) (296 SE2d 693) (1982) (punctuation omitted); *accord Atlantic Coast Line R. Co. v. Godard*, 211 Ga. 373, 377 (1) (86 SE2d 311) (1955).

[21] *Bradley Ctr., Inc.*, 250 Ga. at 202 (1) (punctuation omitted); *accord Atlantic Coast Line R. Co.*, 211 Ga. at 377 (1).

[22] *See Atlanta Obstetrics & Gynecology Grp., P.A. v. Coleman*, 260 Ga. 569, 570 (398 SE2d 16) (1990) ("[W]hether proximate cause exists in a given case is a mixed question of law and fact. It requires both fact-finding in the 'what happened' sense, and an evaluation of whether the facts measure up to the legal standard set by precedent. Ordinarily, both determinations are most appropriately made by a jury

According to the expert testimony at trial, patients under anesthesia are vulnerable to, *inter alia*, obstructed airways, cardiac arrest, allergic reactions, neurological events, and even death. Thus, according to these experts, patients who are under the effects of anesthesia should always have at least two people trained in basic life support in the room with them. The experts explained that this rule is in place because, should a medical emergency arise, one person can begin resuscitation efforts while the other calls for help; the extra personnel assist the person administering anesthesia, but also "protect the patient" and help to maintain the patient's airway; and the rule prevents dentists in remote areas from attempting to perform procedures alone. Although J. B. contends that an anesthetized female patient should never be left alone with a male CRNA, the testimony established that gender is *not* a factor in the rule. Nevertheless, J. B.'s experts opined that GGS violated the standard of care by leaving J. B. alone with Serdula.

At trial, Drs. Salama and Garber and members of the GGS staff who assisted the doctors in performing the various phases of J. B.'s procedure all testified with

upon appropriate instructions from the judge. The decision may be made by the trial judge or appellate court only if reasonable persons could not differ as to both the relevant facts and the evaluative application of legal standards (such as the legal concept of 'foreseeability') to the facts. In other words, although what amounts to proximate cause is undeniably a jury question, it will be determined by the court as a matter of law in plain and undisputed cases." (citation and punctuation omitted)).

regard to their ususal practices and as to the layout of the operating room and office in general. This testimony established that the GGS operating room is located in a busy portion of the office with people entering and exiting the room at all times, and the door to the room is always open with personnel roaming about the hallway.

According to a dental assistant who participated in J. B.'s surgery, when a patient is "handed off" between procedures, an assistant will stay with the patient in the operating room or in the general surgical area, but the patient is never left alone for more than one or two minutes. Dr. Salama also testified that during the transfer period, an assistant may leave the operating room to change out the sterilized equipment, but that personnel are always "in voice range" of the surgical room, that assistants never leave the surgical area of the office, that personnel are always in the surgical area in the event of dental and medical emergencies, and that a patient would never be left alone with a CRNA for an extended period of time. However, Dr. Salama also admitted that the videos of J. B. appeared to have been recorded during the transition period between his surgical procedure and Dr. Garber's cosmetic procedure. Notwithstanding the foregoing circumstances, and despite *admitting* that the nature of Serdula's intervening acts is "relatively uncommon," the majority is "not persuaded . . . that . . . GGS could not reasonably have foreseen them."

11

First, it is undoubtedly true that sexual assaults in dental offices can and do occur, as evidenced by the vile acts perpetrated on J. B. by Serdula.[23] And other testimony established that sexual assaults and molestation are considered "never events" in the medical community, which are occurrences that are preventable and should "never" happen.[24] Additionally, one of J. B.'s experts testified that while the

---

[23] Indeed, GGS's own expert testified that he attended school with a dentist who was caught sexually molesting patients who were under conscious sedation with nitrous oxide.

[24] Although there was expert testimony that "never events" are "foreseeable," it is clear from the testimony as a whole that "never events" are *possible* occurrences, not that these events are, according to ordinary and usual experience, *probable*, or that they happen so frequently that they may be expected to happen again such that they are foreseeable *in a legal sense*. *See infra* notes 18-22 & accompanying text. *See generally* 14 GA. JURIS. PERSONAL INJURY & TORTS *Proximate Cause* § 21:23 (2015) ("To establish proximate cause, . . . a mere possibility of such causation is not enough, and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to grant summary judgment for the defendant. In addition, the injuries caused must be a foreseeable consequence of the defendant's actions. Thus, there must be a direct relationship between the negligence and the plaintiff's injury." (footnotes omitted)). Indeed, there was testimony that "never events," which include incidents such as operating on the wrong body part or leaving a sponge in place, are "foreseeable events. *We don't know who and when [sic] they're going to happen*, but there are policies and procedures in place to prevent them from happening." (Emphasis supplied.) Additionally, though "foreseeable" or "known," the testimony emphasized that many never events are omitted from surgical consent forms because "*[w]e can't list every possible bad thing that could happen . . . .* On a surgical consent we try to hit . . . *common things that can happen* with that surgical procedure . . . ." (Emphasis supplied.) And a broad, general statement that an occurrence such as sexual assault is *always* "foreseeable" runs afoul of the legal principle that "[t]he question of proximate cause *depends upon the facts of each particular case*[.]" *Jacobs v. Taylor*,

12

requirement for monitoring an anesthetized patient is mainly intended to address medical emergencies, it is also "somewhat of a safeguard not only for patient safety reason[s] but for . . . practitioner reasons"; that "[n]o one would want to be left alone with a sedated patient" so as to protect their license and "avoid any kind of accusations of any kind of problems that might occur"; and that having two people in the room protects against sexual assaults and claims of sexual assault. Another expert opined that Drs. Salama and Garber's failure to have the necessary permits[25] resulted in their inability to recognize J. B.'s level of sedation and, thus, "allowed this event to happen" due to a lack of proper procedures and protocols. But GGS could only be liable for Serdula's criminal acts if those acts were foreseeable *as a matter of law—i.e.*, if they were the natural or probable consequences of leaving J. B. alone with Serdula, no matter how briefly, while under the effects of anesthesia.[26] And

---

190 Ga. App. 520, 526 (1) (c) (379 SE2d 563) (1989) (punctuation omitted) (emphasis supplied); *accord Rustin Stamp & Coin Shop, Inc. v. Ray Bros. Roofing & Sheet Metal Co, Inc.*, 175 Ga. App. 30, 31 (1) (332 SE2d 341) (1985); *Valdosta Street R. Co. v. Fenn*, 11 Ga. App. 586 (3) (75 SE 984) (1912) (Syllabus by the Court); *see also Coleman*, 260 Ga. at 569 ("[P]roximate cause is always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy and precedent." (punctuation omitted)).

[25] *See* discussion *supra*.

[26] *See Ontario Sewing Mach. Co.*, 275 Ga. at 686 (2) (holding that if the character of the intervening act is "such that its *probable or natural consequences* could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer, the causal connection is not broken and the original wrong-doer is

contrary to the majority's holding, the evidence simply does not establish that the criminal acts perpetrated on J. B. by Serdula were foreseeable in this legal sense, thereby breaking the causal connection and relieving GGS of liability.[27]

Foreseeable consequences are "those which are probable, according to ordinary and usual experience, or those which, because they happen so frequently, may be expected to happen again."[28] The law does not require one to "anticipate or foresee

_____

responsible for all of the consequences resulting from the intervening act" (punctuation omitted)); *Williams*, 196 Ga. at 337 (2).

[27] *McAuley v. Wills*, 251 Ga. 3, 7 (5) (303 SE2d 258) (1983) ("To hold that an intervening act was not reasonably foreseeable at the time of the defendant's negligent conduct is to say that the defendant's negligence was not the proximate cause of the plaintiff's injury. Although what amounts to proximate cause is undeniably a jury question, it will be determined by the court as a matter of law in plain and undisputed cases." (citation omitted)); *see also Bradley Ctr., Inc.*, 250 Ga. at 202 (1) ("There are cases . . . in which the intervening criminal acts may be foreseeable. In such cases, tort liability is proper. The general rule that the intervening criminal act of a third person will insulate a defendant from liability for an original act of negligence does not apply when it is alleged that the defendant had reason to anticipate the criminal act.").

[28] *See Medical Ctr. v. Cavender*, 331 Ga. App. 469, 473 (1) (771 SE2d 153) (2015) (punctuation omitted); *accord Brown*, 265 Ga. App. at 893 (1); *see Thomas v. Food Lion, LLC*, 256 Ga. App. 880, 882 (1) (570 SE2d 18) (2002) ("The natural and probable consequences are those which human foresight can foresee, because they happen so frequently that they may be expected to happen again."); *Morris v. Baxter*, 225 Ga. App. 186, 187 (483 SE2d 650) (1997) (same); *Jacobs*, 190 Ga. App. at 526 (1) (c) (same); *see also City of Macon v. Dykes*, 103 Ga. 847 (31 SE 443) (1898) ("[T]he negligence of the defendants was not the proximate cause of the injuries of which the plaintiff complained. His injuries were not the natural and probable consequences of such negligence. The only immediate and direct effect of the contact of the wheels of the cart with the rails of the track was the noise. This

14

and provide against that which is unusual or which is only remotely or slightly probable."[29] And the above-referenced expert testimony is founded upon a vague and generalized concept of violence that only suggests the mere *possibility* of improper conduct if a patient is left alone while under anesthesia, not the *probability* of improper conduct.[30] If anything, testimony by GGS's expert regarding a single dental-school classmate who molested patients demonstrated how infrequently such instances occur.[31]

noise may have been a natural and probable result of such contact, but it was not reasonable and probable that an ordinarily gentle and roadworthy horse would have been so frightened by it as to instantly cause him to kick, become entirely unmanageable, and run away. Such a noise and such an extreme fright, in an ordinarily gentle horse, as to cause him to kick and run away, we think, are not known by common experience to be naturally and usually in sequence; the one does not follow the other, according to the usual course of events.").

[29] *Medical Ctr.*, 331 Ga. App. at 473 (1) (punctuation omitted); *accord Dowdell v. Wilhelm*, 305 Ga. App. 102, 105 (1) (699 SE2d 30) (2010); *see also Allan v. Jefferson Lakeside, L.P.*, 333 Ga. App. 222, 228 (2) (775 SE2d 763) (2015); *Jacobs*, 190 Ga. App. at 526 (1) (c); *Campbell v. S. Bell Tel. & Tel. Co.*, 161 Ga. App. 589, 590 (2) (288 SE2d 919) (1982).

[30] *See Brown*, 265 Ga. App. at 895 (1) (holding that assertion as to "common knowledge" regarding propensities for workplace violence were "too vague and generalized to support the . . . claim of liability," and that expert testimony that event was foreseeable was based upon "generalized concepts of violent reactions" and four specific events of workplace violence).

[31] *See Cavender*, 331 Ga. App. at 476 (1) (a) (finding that the opinions of plaintiff's expert illustrated "that even arguably similar acts of violence were so unusual, contrary to ordinary experience, and rare that no reasonable jury could find [the defendant] should have guarded against them" (punctuation omitted)); *Brown*,

Furthermore, it is undisputed that Serdula had been highly recommended to GGS, had nearly perfect credentials and references, had no known prior criminal history, and did not make coworkers or patients feel uncomfortable while in his presence. Thus, nothing made it foreseeable that Serdula would sexually assault a sedated patient if left alone with her for a brief period of time.[32] According, the evidence did not establish that Serdula's intervening criminal act "could reasonably

---

265 Ga. App. at 895-96 (1) (holding that expert testimony as to four other incidents of workplace violence "illustrate[d] vividly that even arguably similar acts of violence were so unusual, contrary to ordinary experience, and rare that no reasonable jury could find the [defendants] should have guarded against them").

[32] *See Doe v. Shapiro*, No. 273950, 2008 WL 583556, at *7 (Mich. Ct. App. 2008) (holding that plaintiff could not establish negligence after CRNA's sexual assault while she was under effects of anesthesia because she failed to demonstrate that defendant doctor and medical center "had actual or constructive knowledge because she presented no testimonial or documentary evidence to indicate that" the defendants "either knew or should have known that [the CRNA] might sexually assault a patient"); *N. X. v. Cabrini Med. Ctr.*, 280 AD2d 34, 39 (N.Y. App. Div. 2001) (holding that "the possibility that a surgical resident with no history of sexual misconduct would enter a surgical recovery room and assault a patient is too remote to be considered legally foreseeable"); *see also Boone v. Udoto*, 323 Ga. App. 482, 484 (1) (747 SE2d 76) (2014) (holding that shooting of club patron in parking lot was unforeseeable to club owners when they had no prior knowledge of shooter's propensities and no prior altercations involving guns). *Cf. Bunn-Penn v. S. Reg'l Med. Corp.*, 227 Ga. App. 291, 294 (2) (488 SE2d 747) (1997) (holding that plaintiff's claim for negligent hiring and retention of technician who sexually assaulted her failed because there was no evidence to authorize a finding that the hospital knew or should have known that the technician was prone to commit such acts).

have been anticipated, apprehended, or foreseen" by GGS, thereby breaking the causal connection.[33]

Thus, I disagree that, as a matter of law, sexual assault is a reasonably foreseeable consequence of leaving a patient alone for brief periods of time with a CRNA who has no known history of sexual violence or deviance, in an operating room left open to an area continuously occupied by multiple medical staff members. And because GGS had no reason to anticipate the criminal act, the general rule applies and Serdula's intervening criminal act insulates GGS from J. B.'s allegations of liability.[34] Moreover, although questions of negligence, diligence, cause, proximate cause, and whose negligence constituted the proximate cause of the harm suffered by the plaintiff are generally for the jury,[35] a trial court can "conclude as a matter of law

---

[33] *Ontario Sewing Mach. Co.*, 275 Ga. at 686 (2) (punctuation omitted); *accord Granger*, 329 Ga. App. at 270 (1).

[34] *Bradley Ctr., Inc.*, 250 Ga. at 202 (1); *accord Atlantic Coast Line R. Co.*, 211 Ga. at 377 (1).

[35] *See Owens*, 330 Ga. App. at 131 (2); *see also Sturbridge Partners, Ltd. v. Walker*, 267 Ga. 785, 786 (482 SE2d 339) (1997) ("[T]he question of reasonable foreseeability of a criminal attack is generally for a jury's determination rather than summary adjudication by the courts." (punctuation omitted)); *Stegall*, 221 Ga. App. at 190 (2) ("Except in plain, palpable and undisputed cases where reasonable minds cannot differ as to the conclusions to be reached, questions of negligence, proximate cause, including the related issues of foreseeability, assumption of risk, lack of ordinary care for one's own safety, lack of ordinary care in avoiding the consequences of another's negligence, contributory and comparative negligence are for the jury.").

that the facts do or do not show negligence on the part of the defendant or the plaintiff

. . . [when] the evidence is plain, palpable[,] and undisputable."[36] This is such a plain,

palpable, and undisputable case that I would hold that the trial court erred in failing

to grant GGS's motion for directed verdict.[37]

---

[36] *Munroe v. Univ. Health Srvs., Inc.*, 277 Ga. 861, 864 (2) (596 SE2d 604) (2004) (quoting *Robinson v. Kroger Co.*, 268 Ga. 735, 739 (493 SE2d 403) (1997)); *see also Coleman*, 260 Ga. at 570 ("[A]lthough what amounts to proximate cause is undeniably a jury question, it will be determined by the court as a matter of law in plain and undisputed cases." (punctuation omitted)); *see also Ga. Power Co. v. Kinard*, 47 Ga. App. 483, 486 (3) (170 SE 688) (1933) ("[When] the evidence plainly and manifestly shows that the injury was caused by the intervening efficient act of the third person . . . , the defendant cannot be held responsible for having produced the injury, and the question is then one of law for determination by the court, and not one of fact for the jury. The liability of the defendant is limited to those consequences which it should reasonably have anticipated as the natural and probable result of its own act or omission.").

[37] *See Stegall*, 221 Ga. App. at 190 (2) (holding that summary judgment to defendant was appropriate when intervening act was not foreseeable as a matter of law); *Tucker Fed. Savings & Loan Ass'n v. Balogh*, 228 Ga. App. 482, 484 (491 SE2d 915) (1997) (holding that summary judgment should have been granted to defendant when the harm suffered by the plaintiff was too remote to arise from any action taken by the bank); *Strickland v. Dekalb Hosp. Auth.*, 197 Ga. App. 63, 67-68 (2) (d) (397 SE2d 576) (1990) (holding that summary judgment to defendant was appropriate when it was not foreseeable that appellant would leave hospital and shoot and kill his wife after being left unattended under the effects of various medications). *Cf. Landings Ass'n v. Williams*, 291 Ga. 397, 399 (728 SE2d 577) (2012) (noting that a "trial court can conclude as a matter of law that the facts do or do not show negligence on the part of the defendant or the plaintiff only where the evidence is plain, palpable and undisputable," and holding that the trial court erred in failing to grant summary judgment to defendant in premises liability case when plaintiff who was fatally injured in an alligator attack assumed the risk of injury and failed to exercise ordinary care for her own safety); *Coleman*, 260 Ga. at 570 (reversing grant

In reaching these conclusions, I recognize that the acts perpetrated by Serdula against J. B. and others were heinous, reprehensible, and inexcusable. J. B. was the victim of outrageous, vile acts committed by a man whose imprisonment has no doubt made the world a safer place. But even in the face of circumstances as horrific and extraordinarily sympathetic as those presented in this case, this Court is nevertheless duty bound to uphold well-settled principles of law. As always, our charge is to see that "justice is fairly dispensed to all parties concerned, and this creates an equally important judicial obligation not to render judgments born only of generosity or compassion."[38] In so doing, I would reverse.

I am authorized to state that Judge Ray and Judge McMillian join in this dissent.

---

of j.n.o.v. when case "involve[d] foreseeable complications relating to abortion procedures that would not have been necessary if not for [doctor's] negligent administration of a hormone shot" and noting that "[t]he record [was] not devoid of evidence that [doctor's] negligence was the proximate cause of [plaintiff's] injuries"); *McAuley*, 251 Ga. at 7 (5) (holding that, "assuming that the [earlier] car crash did not leave [plaintiff] wholly unable to give birth to a child, then the delivery of the child in a manner incompatible with the mother's paraplegia constituted an intervening act not reasonably foreseeable at the time of the car crash," and concluding that car crash was not the proximate cause of child's death such that complaint was properly dismissed).

[38] *Stegall v. Central Ga. Elec. Mem. Corp.*, 221 Ga. App. 187, 190 (2) (470 SE2d 782) (1996); *accord Caribbean Lumber Co. v. Phoenix Assurance Co. of NY*, 227 Ga. App. 236, 238 (3) (a) (488 SE2d 718) (1997).

A15A1491. GOLDSTEIN, GARBER & SALAMA, LLC v. J. B.

RAY, Judge, dissenting.

While I join in Judge Dillard's dissent, I write additionally to address Goldstein, Garber & Salama, LLC ("GGS")'s claim that it is entitled to a new trial because the jury's apportionment of 100 percent of the liability to GGS is against the great weight of the evidence. Even if GGS could be liable on the grounds that the event was reasonably foreseeable, as the majority contends, at a minimum a new trial should be granted as the verdict assigning 100 percent of the fault to GGS is not supported by the evidence.

As has been sufficiently detailed by the majority, this case involves a dental practice, GGS, a highly anaesthetized patient, J. B., and a Certified Registered Nurse Anesthetist, Paul Serdula. During the surgery, GGS left J. B. alone with Serdula for some amount of time. While alone with the patient, Serdula molested J. B. and took

20

videos of her private body parts. J. B. brought suit against both Serdula and GGS, but later dismissed Serdula from the case. Nonetheless, GGS requested that Serdula be included on the verdict for apportionment purposes; however, after the jury found in favor of J. B., it apportioned 100 percent of the fault to GGS and nothing to Serdula, who had committed these vile acts.

The majority finds that the issue of apportionment is not properly before us as GGS waived the argument by failing to obtain a ruling on the issue. Generally, "our appellate courts are courts for the correction of errors of law committed in the trial court. Routinely, this Court refuses to review issues not raised in the trial court." (Citation omitted.) *Heard v. City of Villa Rica*, 306 Ga. App. 291, 293 (1) (701 SE2d 915) (2010).

The majority cites to *Anthony v. Gator Cochran Constr.*, 288 Ga. 79 (702 SE2d 139) (2010), for the rule that a verdict must be upheld even if it is ambiguous as long as one of the constructions would uphold it. However, they ignore the actual holding of *Anthony*. In *Anthony v. Gator Cochran Constr.*, 299 Ga. App. 126, 128-129 (2) (682 SE2d 140) (2009), this court held that Anthony had waived any right to challenge the verdict by its failure to object to the verdict prior to the dismissal of the jury. There, we utilized the same words that the majority uses to defend their holding

21

here[39]. See Majority at ___. On appeal, in a unanimous decision by our Supreme Court, the holding that Anthony had waived the right to challenge the verdict on the basis of it being void was reversed and remanded. In fact, our Supreme Court went as far as to overturn our cases to the extent that they "stand for the proposition that a party's failure to object to a void verdict before the jury is dismissed will result in a valid judgment being entered on that verdict[.]" *Anthony*, 288 Ga. at 80.

This makes it clear to me that we do have the right to examine the verdict to determine whether it is void. A void verdict simply cannot stand. GGS did not waive the issue by failing to obtain a ruling on its objection. Contrary to the majority's holding, it was perfectly acceptable for GGS to raise the issue just to put it on the record for purposes of appeal.

Even if the majority is correct in its assertion that GGS waived its objection, I believe the plain error doctrine would still allow us to review the error. In criminal cases, our Supreme Court has stated that "except in cases of plain error, enumerations of error not timely raised and/or argued shall be waived." (Citation omitted.) *Lynd v. State*, 262 Ga. 58, 60-61 (8) (414 SE2d 5) (1992). "Plain error is that which is so

---

[39]The majority cites to *Clifton v. Clifton*, 249 Ga. 831, 832 (294 SE2d 518) (1982). In *Anthony*, we cited to *Ford Motor Co. v. Tippins*, 225 Ga. App. 128, 133 (5) (b) (483 SE2d 121) (1997). In *Tippins*, we cited to *LaBanz v. Bank South*, 198 Ga. App. 79, 82 (1) (400 SE2d 357) (1990), for the same quote. *LaBanz*, in turn, cited to *Clifton* for the same language.

clearly erroneous as to result in a likelihood of a grave miscarriage of justice or which seriously affects the fairness, integrity or public reputation of a judicial proceeding." (Citation and punctuation omitted.) *Lynd* at 61, n.2. We have also applied this doctrine in civil cases, stating that under "exceptional circumstances appellate courts may, on their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings." (Citation and punctuation omitted.) *Drug Emporium, Inc. v. Peaks*, 227 Ga. App. 121, 125 (2) (a) (488 SE2d 500) (1997). There are sufficient "exceptional circumstances" for us to review the verdict in light of the jury's finding of no fault on the part of Serdula.

The responsible parties in this case were the molester, who is an intentional tortfeasor that committed a sexual assault, and the dental practice, an alleged negligent tortfeasor which put the molester in the position to harm the victim. Georgia law of comparative fault requires, upon proper request, that the fact finder allocate fault to all those responsible for the injury, whether they are litigants to the action or not. OCGA § 51-12-33 (b) & (c). This required the jury to consider Serdula's fault in assessing the liability against GGS, even though Serdula was not then still named as a defendant.

23

Astonishingly, the jury found that Serdula was not at fault at all for J. B.'s injuries, as it assessed 100 percent of the fault to GGS. The evidence at trial very clearly showed that Serdula acted intentionally. On three occasions, he waited until he was alone in the operating room with J. B. and used his phone to videotape himself acting inappropriately with her, essentially, unconscious body. He videotaped down her shirt, removed her underwear and videotaped her private area, and videotaped himself touching her face and mouth with his penis. There is absolutely no question that these were intentional acts, but yet, somehow, the jury found him zero percent at fault for her injuries. This situation most certainly presents circumstances mandating our consideration of the improper verdict due to obvious error. *Drug Emporium, Inc.,* supra. Any verdict allowing *this* intentional tortfeasor to escape blame for his intentional tort simply cannot stand.

GGS argues that it is entitled to a new trial because the jury's apportionment of 100 percent of the liability to GGS is against the great weight of the evidence. We have consistently held that "[n]o court except the trial court is vested with the authority to grant a new trial in a matter relating to the weight of the evidence. The appellate courts are not vested with discretion in this regard as are the trial courts. Thus the only query. . . is whether the evidence supported the verdict." (Citations and punctuation omitted.) *General Ins. Svcs. v. Marcola*, 231 Ga. App. 144 (146) (2) (b)

24

(497 SE2d 679) (1998). It is clear to me that the evidence here does not support the verdict. Although the jury could rationally have chosen to assign a lower percentage than 100 percent to Serdula, the evidence does not support a finding of zero percent fault.

A finding that Serdula did not contribute to J. B.'s injuries is wholly incomprehensible. A finding that Serdula was not at fault would logically be a finding that he did nothing wrong. If he did nothing wrong by molesting J. B., how then can GGS be liable for negligently placing him in the position to molest her? A finding of no fault on Serdula's part would seemingly equate to a finding of no fault on GGS' part.

The majority cites to *Couch v. Red Roof Inns*, 291 Ga. 359 (729 SE2d 378) (2012), for the proposition that whether "the [negligent tortfeasor]. . . [can] establish evidence to support any rational basis for apportionment. . . is a question of fact not relevant to answering the legal questions set forth in this case." Id at 366 (2). In *Couch*, our Supreme Court also defined "fault" and "liable" as they are used in OCGA 51-12-33. "Fault. . . refers to the degree to which each tortfeasor's actions *contributed* to the damages." Id at 361 (1). "One is liable to a plaintiff if he or she is responsible or answerable in law." (Citation and punctuation omitted.) Id at 365 (2). Although J. B. dismissed Serdula from this suit, he most certainly would be

25

answerable in law to her for her injuries. It is also clear that he contributed to her injuries. Therefore, he is both at fault and liable to her.

The majority sets forth two possible ways we could interpret the jury's verdict. I believe either of those possibilities would render the verdict as void. Our law demands that the jury apportion damages between the tortfeasors. Whether they did so with a "determination that GGS's liability would not be offset on the basis of Serdula's fault[,]" see Majority at ___, or that "after considering Serdula's fault and adjusting their award in light of that fault, the jury intended to award J. B. $3,700,000 from GGS and that. . . they expressed their intent in a way that ensured the judge would not further reduce the award[,]" see Majority at ___, they did not properly apportion the fault between GGS and Serdula.

The root problem in this case comes from the fact that Georgia law allows the allocation of fault between an intentional actor and a negligent actor. Georgia law allows the trier of fact to assess percentages of fault to all parties responsible because of strong public policy adopted by the legislature that a party should only be liable for the portion of harm that it personally caused. When an injury can be said to have been caused by multiple actors, we apportion the liability to the parties based on their individual portion of fault in causing the injury.

26

However, when we are dealing with an intentional tortfeasor and one who is merely negligent, apportionment does not work so well. Consider the inverse of this case. What if J. B. had sued GGS and Serdula, as she did, but prior to trial, she voluntarily dismissed GGS because the corporation was bankrupt. For the sake of argument, assume that Serdula was wealthy and had the means to pay any judgment. Would we want Serdula to be able to decrease his liability for the acts he intentionally performed by pointing to GGS and arguing that had it not put him in that position, he could not have performed the acts? The "I did it, but it is not fully my fault because they put me there" defense is, I believe, unconscionable; yet, our law enables and empowers such a defense. We should not want criminal defendants escaping civil liability because a negligent actor theoretically allowed them to be in that position.[40] Individuals who commit intentional acts should be held fully responsible for their acts, both in the criminal and the civil justice system.[41]

Our policy of only imposing liability on the party who caused the harm is very important. However, there are other ways of imposing liability on a negligent

---

[40] See *In re E. C.*, 444 SW3d 760 (Texas Court of Appeals 2014) (16 year old who killed four people while driving drunk argued "affluenza" defense claiming that he was the product of wealthy privileged parents who never set limits for him.)

[41] For alternative approaches to avoid the dilemma that is present in this case, see the Restatement Third of Torts, § 14, and the statutory scheme of the State of Florida, Fla. Stat. § 768.81 (4).

tortfeasor which operate in a cleaner fashion and avoid the situation which arose in this case.[42]

---

[42] See Ellen M. Bublick, *The End Game of Tort Reform: Comparative Apportionment and Intentional Torts*, 78 NOTRE DAME L. REV. 355 (2003) (Detailed analysis of consequences of including intentional torts in comparative fault systems, as well as "guidance for courts and legislatures navigating the complex terrain of intentional and negligent fault comparisons").